**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

STACI L. BROWNFIELD,

      Plaintiff,

-vs-                              Case No.   3:16-cv-1433-J-34JRK

CITY OF LAKE CITY,

      Defendant.

_____

## O R D E R

**THIS CAUSE** is before the Court on Defendant City of Lake City's Motion for Summary Judgment (A Dispositive Motion) with Supporting Memorandum of Law (Doc. 22; Motion), filed on September 15, 2017.   Plaintiff Staci L. Brownfield filed a response in opposition to the Motion on October 6, 2017.  See Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 32; Response).  With leave of Court, see Order (Doc. 37), Defendant City of Lake City (the City) filed a reply in support of the Motion on November 7, 2017, to which Brownfield filed a sur-reply on November 21, 2017. See Defendant City of Lake City's Reply to Plaintiff's Response in Opposition to the City's Motion for Summary Judgment (Doc. 39; Reply); Plaintiff's Sur-Reply in Opposition to Defendant's Motion for Summary Judgment and Reply (Doc. 41; Sur-Reply). Accordingly, this matter is ripe for review.[1]

_____

[1]    Brownfield asserts two causes of action in the Amended Complaint (Doc. 9): an equal protection claim, pursuant to 42 U.S.C. § 1983 (Count I), and a claim under the Equal Pay Act, 29 U.S.C. § 206(d)(1) (Count II).  See Amended Complaint at 7-8.  In the Motion, the City moves for the entry of summary

# I.    Background[2]

This case arises out of Brownfield's termination from the Lake City Police Department (LCPD) on June 23, 2014.  See generally Amended Complaint (Doc. 9), filed December 29, 2016.[3]   Brownfield first began working for the LCPD in approximately

---

judgment in its favor on both of these claims.  See Motion at 1-2.  In her Response, Brownfield states that she is not pursuing her Equal Pay Act claim.  See Response at 17.  Because Brownfield has abandoned this claim, no further discussion is necessary and the Court will grant the City's Motion as to the Equal Pay Act claim set forth in Count II of the Amended Complaint.

[2]    For the purposes of resolving the City's Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Brownfield. However, the Court notes that these facts may differ from those ultimately proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

[3]    Because of the vague way in which Brownfield drafted her Amended Complaint, it is unclear whether her disparate treatment claim encompasses any other purported adverse employment actions, aside from her termination.  See Amended Complaint ¶¶ 37-42.  In her Amended Complaint, and again in the statement of facts portion of her Response, Brownfield describes several incidents over the course of her employment at the LCPD, unrelated to her termination, which she views as gender discrimination.  See Amended Complaint ¶¶ 10-13, 23; Response at 2-4.  Specifically, these incidents relate to negative evaluations, reassignments, training request denials, criticism of her attire, being singled out for tardiness and being told to write herself up.  See Response at 2-4.  Brownfield also briefly mentions two internal affairs investigations that were initiated against her and another officer for what she believes were improper reasons.  See Response at 11.  In the Motion, the City argues that a number of these incidents are barred by the statute of limitations.  See Motion at 6-9.  The City also contends that some of these incidents do not constitute adverse actions, see id. at 10 n.3, and with respect to Brownfield's training requests, offers a non-discriminatory reason for their denial, id. at 17.  Brownfield does not respond to any of these arguments.  Indeed, in her Response, Brownfield's arguments are focused entirely on her termination.  See Response at 13-18.  Moreover, on March 12, 2018, the parties filed a joint Pretrial Statement (Doc. 44) in which they list the factual and legal issues remaining to be litigated.  See Pretrial Statement at 3.  Notably, the parties do not identify any issues remaining for litigation other than those pertaining to Brownfield's termination.  See Pretrial Statement at 3; see also id., Ex. A: Plaintiff's Statement of the Case at 1 ("Ms. Brownfield's case primarily revolves around her illegal termination on or about June 23, 2014.").
    On this record, to the extent Brownfield's Amended Complaint could be construed to allege any other claims of discrimination, those claims are abandoned in light of Brownfield's failure to address them in response to the City's Motion for Summary Judgment.  See Case v. Eslinger, 555 F.3d 1317, 1329 (11th Cir. 2009) ("When a party moves for final, not partial, summary judgment, . . . 'it [becomes] incumbent upon the [nonmovant] to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in [the moving party's] favor.' . . . Failure to do so may result in waiver or abandonment of the issue." (second, third and fourth alteration in original) (quoting Johnson v. Bd. of Regents of the Univ. of Ga., 263 F.3d 1234, 1264 (11th Cir. 2001))); see also Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").  Likewise, Brownfield abandoned any such claims by failing to include them in the Pretrial Statement.  See Local Rule 3.06(e) ("All pleadings filed by any party prior to filing of the pretrial statement shall be deemed to be merged therein . . . .  The pretrial statement and the pretrial order, if any, will control the course of the trial . . . ."); see also Delta Health Grp. Inc. v. Royal Surplus Lines Ins. Co., 327 F. App'x 860, 867 (11th Cir. 2009) ("The pretrial order supersedes the pleadings.") (citing Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1012 (11th Cir. 1982)); Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1461-63 (11th Cir. 1998) ("[W]e cannot conclude in this instance that the district court's construction of the pretrial order—that is, that

May of 2001, while David Albritton was the police chief.  See Motion, Ex. 1: Deposition of Staci L. Brownfield (Doc. 21-1; Brownfield Dep.) at 17.  She resigned from the LCPD in 2007, but returned about a year later, in the fall of 2008, at the behest of Captain Bruce Charles.  Id. at 21-23.  Charles, who became the acting police chief following Albritton's retirement, asked Brownfield to return because the LCPD needed officers.  Id. at 23.  In September of 2009, Argatha Gilmore became the Chief of Police at the LCPD, and she remains in that position through the present.  Id. at 40, 49; see Motion, Ex. 2: Declaration of Argatha Gilmore (Doc. 21-2; Gilmore Decl.) ¶ 3.

When Brownfield returned to the LCPD in 2008, after she completed field training, she worked as a police officer assigned to patrol.  See Brownfield Dep. at 29-30.  In 2009, Brownfield became trained and designated as a traffic homicide investigator.  Id. at 69-70.  As a traffic homicide investigator, Brownfield continued in her "regular day job," but would be called out to do measurements and complete a "traffic homicide packet" in the event of a severe crash involving great bodily injury.  See id. at 70.  In addition, Brownfield would occasionally be asked to serve as the acting supervisor, or "officer in charge," to cover a shift when the regular supervisor was out.  See id. at 46-47.  In 2011, she was assigned to the crime prevention unit, where she remained for six months.  See id. at 53-54.  Brownfield was then told that Gilmore was creating a traffic unit and she was going to be assigned to that unit.  Id. at 56.  However, the traffic unit did not come to fruition at that time and Brownfield was moved back to patrol.  Id. at 54-

---

[plaintiff] abandoned his . . . claim by virtue of the pretrial stipulation—was unreasonable.  As observed by the district court, the pretrial stipulation does not reference [that claim] at any point.").  As such, the Court will not set forth those allegations in detail.  To the extent Brownfield maintains that these events are evidence of the City's discriminatory intent, the Court has reviewed and considered this evidence and will discuss its probative value below.  See infra note 13.

57.   In March 2012, Brownfield was reassigned from patrol to the accreditation team, where she remained until 2013, when she moved back to patrol.   <u>Id.</u> at 63-64, 69.

On the evening of November 12, 2013, a Florida Highway Patrol (FHP) officer arrested Brownfield for driving under the influence (DUI), a misdemeanor, after she crashed her car into a guardrail.   <u>See</u> Motion, Ex. 3: Declaration of John Andrew "Andy" Miles (Doc. 21-3; Miles Decl.) ¶ A: FHP Arrest Report. At the time of the accident, Brownfield was on her way home from Lieutenant John Stock's house, where she had stopped after work.   <u>See</u> Brownfield Dep. at 73.   Brownfield arrived at Stock's house around 6:30, and stayed there for a few hours.   <u>See</u> Response, Ex. 36: Sworn Statement of John Stock (Doc. 31-18; Stock Stmt.) at 16.   While she was there, Brownfield had one alcoholic beverage, a Long Island iced tea, although she did not consume the entire serving because some of the drink spilled.   <u>See</u> Brownfield Dep. at 76; Stock Stmt. at 15-16.   Sometime after 9:00 p.m., Brownfield got in her car to drive home.   <u>See</u> Stock Stmt. at 16.   Less than twenty-five minutes after leaving Stock's home, <u>id.</u> at 15, according to Brownfield, she reached down for her phone and in doing so, crashed her car into the guardrail.   <u>See</u> Brownfield Dep. at 81-82.   At some point, Stock arrived at the scene of the accident and observed that "[t]he guardrail had gone in from the front, like, through the engine and up into the passenger compartment and out the roof, the guardrail was. [sic]   It looked like it should have been a fatality."   <u>See</u> Stock Stmt. at 11. As a result of the accident, Brownfield suffered an injury to her leg, as well as an impact to her head which caused bleeding from the side of her head at the scene of the accident. <u>See</u> Brownfield Dep. at 75-76, 81-82, 179-80.   Nonetheless, she declined to be taken to the hospital via ambulance.   <u>See id.</u> at 81-82.   When Stock saw Brownfield the next day

she had bruises on the right-side of her head, and "her leg was swollen, her knee. . . . The knee was really bad." See Stock Stmt. at 13-14.

An FHP officer investigated the accident, and asked Brownfield to perform field sobriety exercises at the scene, to which she consented. See Brownfield Dep. at 74-75, 86; see also FHP Arrest Report. Following the field sobriety test, the FHP officer placed Brownfield under arrest for DUI. See FHP Arrest Report. The FHP officer also tested Brownfield's breath with an Intoxilizer. See Brownfield Dep. at 85-86; see also FHP Arrest Report. Both of Brownfield's breath-test results were over the legal limit, specifically, the tests indicated that she had a blood alcohol content of .137 and .133. See Brownfield Dep. at 86; see also FHP Arrest Report. The officer transported Brownfield to the Columbia County Jail where she spent the night and was released the following morning. See Brownfield Dep. at 74, 86, 88.

Significantly, Brownfield maintains that she was not driving with a blood alcohol level over the legal limit and challenges the validity of both her field sobriety test and her breath tests. Brownfield asserts that she had gum in her mouth at the time of the breath tests which can alter the results of the test. See Brownfield Dep. at 76-77. According to Brownfield, the officers failed to check her mouth prior to administering the tests, as was their responsibility, which invalidates both tests. Id. at 76-79. Brownfield explains that as a result of her head injury, she does not remember when she put the gum in her mouth and was not thinking clearly enough to inform the officers of the gum prior to the breath tests. See id. at 75-77. In addition, Brownfield believes that her use of her asthma inhaler prior to the crash, as well as her inhalation of air bag dust following the accident, may have altered her breath test results. See id. at 82-84. Brownfield also

contends that due to her leg and head injuries from the crash, she was unable to perform the field sobriety tests correctly.  See id. at 81-82, 179-80.  Brownfield does concede that she committed the traffic infraction of careless driving because she was reaching for her phone when the accident occurred.  Id. at 107.

The morning after the accident, at Gilmore's direction, the LCPD issued a press release on the incident.  See Brownfield Dep. at 103; Gilmore Decl. at 3, ¶ 12,[4] Ex. E. The press release stated that Brownfield had been in a single-vehicle crash while off duty, and was arrested for DUI after she performed field sobriety exercises.  See Gilmore Decl., Ex. E.  It also noted the Intoxilizer breath test results and announced that the "traffic crash investigation is still ongoing and the Lake City Police Department internal investigation will commence following the completion of the investigation by FHP."  Id., Ex. E.  Gilmore made the decision to issue a press release because of the "nature of the allegations" involving Brownfield, and because Brownfield "was herself a Traffic Homicide Investigator."  See id. at 3, ¶ 12.  Gilmore explained that she sought "to promote transparency and integrity" by informing the public that the "LCPD was not going to sweep this incident under the rug," and would allow the FHP to investigate the matter fully, followed by its own investigation and appropriate discipline if warranted.  Id.

Upon her release from jail, Brownfield received a written document notifying her that she was being placed on administrative leave, with pay.  See Brownfield Dep. at 87-88.  LCPD also notified Brownfield that it would conduct an internal affairs (IA) investigation into the accident after the FHP finished its investigation.  Id. at 102.

---

[4]     The Court notes that there are two paragraphs labeled number 12, and two paragraphs labeled number 13 in the Gilmore Declaration.  See Gilmore Decl. at 3-4.  Because the duplicate numbers are on different pages of the Declaration, the Court will distinguish between these paragraphs by citing both the page of the Declaration and the paragraph number.  See Gilmore Decl. at 3-4.

Nonetheless, although the FHP completed its investigation almost immediately after the accident, the LCPD did not begin its IA investigation until February of 2014. Id. at 102-03, 105; Gilmore Dep. at 101; Miles Decl. ¶ 6, Ex. B. According to Gilmore, she initiated the IA investigation into Brownfield's accident because there was "an officer involved in a traffic crash, and [Gilmore] was informed that alcohol was involved in the traffic crash." See Gilmore Dep. at 19-20.

Sergeant Andy Miles conducted IA Investigation 14-01 into Brownfield's accident and subsequent arrest. See Miles Decl. ¶¶ 5-6, Ex. B: IA Investigation 14-01. Notably, as relevant to this action, the findings of IA Investigation 14-01 included the following:

> 12. Officer Brownfield used her asthma inhaler.
> 13. Lt. Stock said Officer Brownfield did not appear intoxicated.
> 14. Officer Brownfield said she did not feel the effects of the alcohol.
> . . .
> 10. Officer Brownfield said she was "knocked out" from the impact.
> . . .
> 25. [A witness] said Officer Brownfield appeared to "go out" while she was talking to her. She wasn't sure if Officer Brownfield actually lost consciousness.
> . . .
> 53. Officer Brownfield said the doctor diagnosed her with a concussion sustained in the crash, and a sprained knee.
> 54. Officer Brownfield said she did research and learned the intoxilyzer results can be altered by inhaling the air bag dust and or chewing some gums like orbit sugar free gum.
> 55. Officer Brownfield said she was in her vehicle for several minutes after the crash and inhaled the dust and gas from the air bag deploying.
> 56. Officer Brownfield said she chewed gum during the breath testing.
> 57. Officer Brownfield said she does not think the breath test results are accurate.

See IA Investigation 14-01 at 10-11. The "Acts of Misconduct" alleged in IA Investigation 14-01 were "unbecoming conduct" and "violation of law or rules." See IA Investigation 14-01 at 7-8. Miles recommended sustaining both of the misconduct allegations against Brownfield. See Miles Decl. ¶ 7; IA Investigation 14-01 at 12-13. Brownfield appealed

Miles' findings, but on April 16, 2014, Miles responded noting that Brownfield "did not provide any new witnesses to be interviewed or any new evidence relevant to this administrative investigation," and therefore he denied her "appeal to change the disposition of the findings." See Response, Ex. 41. Miles completed his investigation on May 22, 2014, and the recommendation to sustain the allegations moved up the chain of command where Gilmore approved it on May 23, 2014. See Miles Decl. ¶ 8; IA Investigation 14-01 at 13. At that point, IA Investigation 14-01 was "forwarded to [Brownfield's] immediate supervisor for a recommendation as to the appropriate discipline." See Miles Decl. ¶ 8.

On May 25, 2014, Brownfield's supervisor, Sergeant Robert Milligan, recommended Brownfield be suspended for 9 days. See Gilmore Decl. at 3, ¶ 13, Ex. F; see also Motion, Ex. 4: Declaration of Michele Greene (Doc. 21-4; Greene Decl.) ¶ 11, Ex. F: Corrective Action Recommendation. The Corrective Action Recommendation was then sent to the City's Human Resources department for review to "ensure the recommended discipline is consistent with discipline given to other City employees for similar offenses." See Gilmore Decl. at 4, ¶ 12. Michele Greene, the City's Director of Human Resources, reviewed Milligan's Recommendation and "questioned whether that discipline [was] consistent with discipline given to other City employees for similar offenses." See Greene Decl. ¶ 11. Specifically, Greene recalled that Lake City Firefighter Donald Wilson, Jr. was terminated after he was arrested for lewd and lascivious conduct, and before those charges were resolved. Id. ¶ 12. In addition, Greene compared Brownfield's case to that of Misty Gable, "a former female police officer who was terminated by the City in 2003 following her arrest for DUI." Id. ¶ 13. Notably,

the LCPD Chief at the time of Gable's termination was David Albritton and Joe Cone was the City Manager. See id., Ex. H. Based on the foregoing, Greene prepared a memorandum advising Gilmore that she believed that termination was the appropriate discipline under the circumstances. See id. ¶ 16, Ex. J.

The Corrective Action Recommendation then moved up the chain of command to Lieutenant Clint VanBennekom and Assistant Chief Gerald Butler, who both recommended termination. See Greene Decl., Ex. F; Gilmore Dep. at 35-36; see also Response, Ex. 29: Deposition of Clint VanBennekom (Doc. 31-11; VanBennekom Dep.) at 9-10, 16; Response, Ex. 33: Deposition of Gerald Butler (Doc. 31-15; Butler Dep.) at 6-8. Brownfield wrote a lengthy memorandum to Butler, dated June 6, 2014, requesting that he reconsider his disciplinary action recommendation. See Response, Ex. 40. Notably, she declared her innocence, asked that he "hold off on any further disciplinary actions in [her] case until the conclusion of [her] criminal case" and maintained that it would be proven in court that she was not guilty of DUI. Id. She also took issue with the LCPD's decision to issue a press release in her case, pointed to the arrests of other employees as comparators, and raised other arguments as to why termination was not warranted. Id. On June 10, 2014, Butler responded that he had reviewed her written appeal and his recommendation of termination would stand. Id.

Ultimately, the decision on whether to terminate Brownfield belonged to Gilmore. See Gilmore Dep. at 33-34. On June 18, 2014, Gilmore wrote a letter to Brownfield advising her that she was terminating Brownfield's employment with the LCPD. See Gilmore Decl. ¶ 14, Ex. G. Gilmore made the decision to terminate Brownfield's employment "[b]ased on the totality of [the IA] investigation." See Gilmore Dep. at 15.

Wendell Johnson, as the City Manager, signed off on the termination. <u>See</u> Response, Ex. 32: Deposition of Wendell Johnson (Doc. 31-14; Johnson Dep.) at 16; <u>see also</u> Gilmore Dep. at 67. Indeed, Johnson is required to sign off on the hiring or termination of all City employees except the City clerk and City attorney. <u>See</u> Johnson Dep. at 8. However, Johnson has "delegated the responsibility to the department directors to make the decision to either hire or terminate an employee under their control." <u>Id.</u> at 9. As such, Johnson did not feel the need to review IA Investigation 14-01 regarding Brownfield because he "trusted the chief's judgment." <u>Id.</u> at 48. Nonetheless, Johnson agreed with Gilmore's decision to terminate Brownfield because Brownfield was "a police officer that had a DUI." <u>See id.</u> at 31. In Johnson's view, even though Brownfield was not convicted of the DUI, "that does not change the fact that [she was] charged with it" and exceeded the legal limits on her breathalyzer test. <u>Id.</u> at 33-34. Brownfield used the City's grievance process to appeal her termination, but Johnson, as the hearing officer, "found no extenuating factors to support overturning [her] termination of employment with the [LCPD.]" <u>See</u> Response, Ex. 25; Johnson Dep. at 16-17.

Significantly, the City finalized IA Investigation 14-01 and terminated Brownfield while the criminal charges against her were still pending. <u>See</u> Gilmore Dep. at 101-02. Indeed, Brownfield's criminal case was not resolved until October of 2014, several months after her termination, at which time she entered a plea of no contest to a charge of reckless driving. <u>See</u> Brownfield Dep. at 109-10. [5] Although Brownfield had

---

[5] The Court notes that the Florida Criminal Justice Standards and Training Commission also investigated Brownfield's conduct and opted not to pursue any disciplinary action against her. The Commission found in pertinent part that:

> On October 7, 2014, Brownfield pled nolo contendere to reckless driving. Adjudication was withheld, her driver's license was suspended 90 days, and she was ordered to complete DUI School and pay court costs and fines. Regarding the breath test results, a

"repeatedly asked [Gilmore] to wait until the conclusion of the criminal proceedings to make a decision as to discipline," Gilmore refused to do so.  See Gilmore Decl. at 4, ¶ 13.  According to Gilmore, she was not required by policy to wait until the conclusion of the criminal proceedings.  Id.  Gilmore explains that she declined to wait until the conclusion of the criminal case because "regardless of the outcome of the criminal proceedings," she felt that she "could not have a [traffic homicide investigator] who would forever be compromised in her ability to testify at trial and rumored to have gotten off on a technicality based on superior knowledge of DUI investigation procedures and protocols."  See id.  In Gilmore's view, she

> had an officer who, in [Gilmore's] opinion, got off on a technicality with this, and so, being an officer, you have to be able to testify in court.  You have to be able to not have your actions questioned, especially when you've been arrested, you know, for something.  And now, if I bring her back in in this role as an officer, I think that just creates problems.

See Gilmore Dep. at 100.[6]  Gilmore further explains that seven months had passed since the accident, which "is a long time," and she was receiving "complaints from citizens and from [the City Manager] that [Gilmore] had [Brownfield] out for seven months."  See

---

ruling in the criminal hearing demonstrates that staff would not be able to prove substantial compliance with administrative requirements.  Additionally, the field sobriety exercises are not admissible during disciplinary proceedings due to the head injury suffered by Brownfield during the crash.  Therefore, staff recommends no causing this case, and legal concurs.

See Response, Ex. 38 (Doc. 31-20).  As such, the Commission found "insufficient grounds" under the statutory guidelines to pursue any disciplinary action.  Id.  In the February 20, 2015 letter informing Gilmore of these findings, the Commission noted that "[d]eterminations by the Commission are separate and distinct from any employing agency action, and in no way reflects upon their investigation, findings, conclusions, and/or disciplinary action."  Id.

[6]     During Gilmore's deposition, Brownfield's counsel "moved to strike" this portion of Gilmore's testimony as non-responsive to the question.  See Gilmore Dep. at 100.  However, Brownfield herself quotes the "got off on a technicality" language in her brief, citing this portion of Gilmore's deposition.  See Response at 10.  Moreover, she failed to argue in her Response or her Sur-Reply that the Court should not consider the testimony.  Accordingly, it is properly before the Court.

Gilmore Dep. at 20.[7]    According to Gilmore, she waited to take action because she liked Brownfield and "wanted her to find something," id. at 21, but after the complaints, she "decided to go ahead and move forward, because it was taking a long time . . . ." Id. at 20-21, 100-01.

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).    The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[8]    An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.   Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).   "[A] mere scintilla of

---

[7]    Indeed, Johnson testified that he did "contact Chief Gilmore and ask[] her of the status at a point in time several months after the incident," because "it had went on for many months and [Brownfield] was on leave [with] pay and I was just curious as to what the status was."   See Johnson Dep. at 14-15.  Although he did not instruct Gilmore that she needed to take some action because Brownfield had been on leave for too long, he did "imply that it was costing the City money."   Id. at 16.

[8]    Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."   Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.   "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."   Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013).   Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III. Applicable Law

Section 1983 provides a remedy when any person acting under color of state law deprives another of any right, privilege, or immunity secured by the Constitution. 42 U.S.C. § 1983. Brownfield alleges that the City intentionally discriminated against her

based upon gender in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  See Amended Complaint ¶¶ 37, 42. "The Equal Protection Clause ensures a right to be free from intentional discrimination based upon . . . gender."  Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1268 (11th Cir. 2003) (citations and footnote omitted).   As such, the Eleventh Circuit Court of Appeals has "recognized an equal protection right to be free from employment discrimination," and has "found various . . . gender-based employment decisions by public officials, including those concerning . . . termination, in violation of that constitutional right."  Id. (citations omitted).   Additionally, Eleventh Circuit precedent establishes that a "person acts under color of state law when he acts with authority possessed by virtue of his employment with the state." Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).

In this action, Brownfield alleges a claim of discrimination premised on a theory of disparate treatment in that she contends that the City terminated her employment because of her gender.  See Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807–08 (11th Cir. 2010).   A plaintiff may establish a disparate treatment discrimination claim through the introduction of direct or circumstantial evidence.[9]  Lee v. U.S. Steel Corp., 450 F. App'x 834, 839 (11th Cir. 2012) (citing Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010)).[10]   Where, as here, the plaintiff relies on

---

[9]      Discrimination claims brought under Title VII and Section 1983 "have the same elements where the claims are based on the same set of facts." Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1275 n.5 (11th Cir. 2008).   Thus, case law interpreting equal protection violations under a Title VII framework is equally applicable to Brownfield's Section 1983 claim.

[10]      "Although an unpublished opinion is not binding . . . it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

circumstantial evidence of discrimination, [11] the Court applies the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Alvarez</u>, 610 F.3d at 1264; <u>Hawkins v. Potter</u>, 316 F. App'x 957, 960 (11th Cir. 2009). Under the <u>McDonnell Douglas</u> framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." <u>Burke-Fowler v. Orange Cnty., Fla.</u>, 447 F.3d 1319, 1323 (11th Cir. 2006). If the plaintiff presents a prima facie case of discrimination, that evidence "creates a presumption that the employer unlawfully discriminated against the employee," and the burden of production then shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254–56 (1981); <u>Alvarez</u>, 610 F.3d at 1264.

If the employer meets this burden of production, the burden shifts back to the plaintiff to show that the stated reason is a mere pretext for unlawful discrimination and was not the "true reason for the employment decision." <u>Burdine</u>, 450 U.S. at 256; <u>see also</u> <u>Alvarez</u>, 610 F.3d at 1264; <u>Holifield v. Reno</u>, 115 F.3d 1555, 1565 (11th Cir. 1997)

---

[11]     Brownfield does not argue that she has any direct evidence or statistical proof of discrimination. <u>See</u> Response at 13. A plaintiff may "present direct evidence of discriminatory intent in the form of actions or remarks of the employer reflecting a discriminatory attitude." <u>Hill v. Metro Atlanta Rapid Transit Auth.</u>, 841 F.2d 1533, 1539 (11th Cir. 1988), <u>amended on reh'g on different grounds</u>, 848 F.2d 1522 (11th Cir. 1988). "Direct evidence is that which shows an employer's discriminatory intent 'without any inference or presumption.'" <u>Hinson v. Clinch Cnty., Ga. Bd. of Educ.</u>, 231 F.3d 821, 827 (11th Cir. 2000) (quoting <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998)). However, "only the most blatant remarks, whose intent could be nothing other than to discriminate" will constitute direct evidence of discrimination. <u>Carter v. City of Miami</u>, 870 F.2d 578, 582 (11th Cir. 1989).

("[T]he plaintiff has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination.") (citing McDonnell Douglas, 411 U.S. at 804)). A plaintiff may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256 (citing McDonnell Douglas, 411 U.S. at 804–05). "Despite these shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant[s] intentionally discriminated against her." Alvarez, 610 F.3d at 1264. Notably, the Eleventh Circuit has observed that the inquiry does not center "on reality as it exists outside of the decision maker's head." Id. at 1266. Rather, the pretext inquiry focuses on "the employer's beliefs, and not the employee's own perceptions of [her] performance." Holifield, 115 F.3d at 1565.

## IV. Discussion

In the Motion, the City argues that Brownfield cannot establish a prima facie case of gender discrimination. See Motion at 9-10. While the City concedes that Brownfield has established three of the four prongs of her prima facie case, the City maintains that Brownfield "cannot establish that she was treated less favorably than similarly situated employees who are not members of her protected class." See id. at 10. In addition, the City contends that Brownfield's DUI arrest was a legitimate, non-discriminatory reason for her termination, and that Brownfield fails to rebut that reason with any evidence of pretext. Id. at 14-17. Last, the City contends that Brownfield fails to establish any basis for municipal liability because Johnson, not Gilmore, is the final decision-maker for the City,

and there is no evidence that he approved of Gilmore's purportedly discriminatory motive.
See id. at 18-19.

   In her Response, Brownfield contends that she has presented evidence of several
male employees who engaged in similar misconduct and were treated more favorably than
Brownfield.  See Response at 14.  Specifically, Brownfield points to the following current
or former LCPD employees: Lieutenant Clint VanBennekom, Stephen Shaw, and Donald
Miles.  Id. at 11-15.  Brownfield contends that "several" LCPD firefighters are relevant
comparators as well, but names only two, Greg Collett and Dwight Boozer.  Id. at 12, 14-
15.  Significantly, none of these individuals had documented arrests and criminal charges
brought against them while serving as a police officer for the LCPD.  As such, the Court
questions whether any of them could constitute a valid comparator for purposes of
satisfying Brownfield's prima facie case.  Nonetheless, the City has come forward with
evidence of a legitimate, non-discriminatory reason for terminating Brownfield's
employment—her DUI arrest, and specifically its impact on her ability to testify effectively
at trial.  See Gilmore Decl. at 4, ¶¶ 13-14.  Thus, the Court will assume, without deciding,
that Brownfield has established a prima facie case of gender discrimination, and consider
instead whether there is a genuine issue of material fact as to the question of pretext.  See
Armindo v. Padlocker, Inc., 209 F.3d 1319, 1321 (11th Cir. 2000); see also Rioux v. City
of Atlanta, Ga., 520 F.3d 1269, 1277 (11th Cir. 2008) (examining the sufficiency of
plaintiff's comparator evidence as part of the pretext analysis); E.E.O.C. v. Joe's Stone
Crabs, Inc., 296 F.3d 1265, 1273 (11th Cir. 2002) ("'[W]here the defendant has done
everything that would be required of him if the plaintiff had properly made out a prima facie
case, whether the plaintiff really did so is no longer relevant.'" (quoting U.S. Postal Serv.

Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983))); Brown v. Davis, 684 F. App'x 928, 935, 937 n.6 (11th Cir. 2017). Indeed, regardless of whether Brownfield has presented evidence of an appropriate comparator, "failure to produce a comparator does not necessarily doom the plaintiff's case." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). If the plaintiff presents "a convincing mosaic of circumstantial evidence" to raise a reasonable inference that the decision maker acted with discriminatory intent, summary judgment against the plaintiff is improper. Id. at 1328. Whether analyzing Brownfield's claim under McDonnell Douglas or otherwise, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with [Brownfield]." Burdine, 450 U.S. at 253.

In order to show pretext, a plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision." Burdine, 450 U.S. at 256. A reason cannot be a "pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original, quotations omitted). So long as the employer's "reason is one that might motivate a reasonable employer, [the] employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000); see also Alvarez, 610 F.3d at 1256 ("[The Court does] not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." (quoting Chapman, 229 F.3d at 1030)). In this regard, an "employer may [take action against] an employee for

a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Walton v. Cives Corp., 491 F. App'x 29, 32 (11th Cir. 2012) (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984)). A plaintiff may demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted).

Significantly, at this stage, the plaintiff's burden of demonstrating that the employer's proffered reason was not the true reason for her termination "merges with the [plaintiff's] ultimate burden of persuading the court that she has been the victim of intentional discrimination." Burdine, 450 U.S. at 256. Thus, "the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination." Smith, 644 F.3d at 1325. In this respect, while the absence of a comparator is not fatal to Brownfield's § 1983 claims, the presence or absence of a comparator is relevant, as is other circumstantial evidence, to whether the plaintiff has proven that the adverse employment action was the result of discrimination. Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1154 (11th Cir. 2005); see also Burke-Fowler, 447 F.3d at 1325 (affirming district court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination").

Brownfield makes several arguments to support her contention that the City's decision to terminate her employment was based on gender. As stated above, Brownfield points to VanBennekom, Shaw, Miles, and two firefighters, as similarly situated male employees who engaged in similar misconduct and were treated more favorably. See Response at 11-14. She also asserts that the City's explanation is unworthy of credence because her conduct was not as egregious as other officers who were terminated following arrest or misconduct, specifically, Gable and Wilson, the individuals noted by Greene, as well as Shea Brown and David Broom. See id. at 11-12, 14. Finally, Brownfield argues that the City's decision to terminate her for the DUI arrest is a pretext for gender discrimination because she actually was not driving under the influence and the evidence against her, namely the breath tests and field sobriety test, was invalid. See id. at 18.

The Court turns first to Brownfield's comparator evidence. "When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" See Burke-Fowler, 447 F.3d at 1323 (quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999)). "'The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed.'" See Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) (quotation omitted). Significantly, "'the quantity and quality of the comparator's misconduct'" must be "nearly identical" to that of the plaintiff in order to "'prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" Burke-Fowler, 447 F.3d at 1323 (quoting Maniccia, 171 F.3d at 1368); see also Rioux, 520 F.3d at 1280 ("Misconduct merely 'similar' to the misconduct

of the disciplined plaintiff is insufficient."). Moreover, "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." See Silvera, 244 F.3d at 1261 n.5 (collecting cases); see also Horn v. United Parcel Serv., Inc., 433 F. App'x 788, 793 (11th Cir. 2011) ("[I]t is relevant, but not dispositive, that different decisionmakers were involved in administering discipline.").

Here, the incidents involving VanBennekom, Shaw and Miles are not comparable to Brownfield's DUI arrest. VanBennekom was arrested and charged with a DUI, to which he pled guilty, but this arrest occurred in 1986, approximately eight years before he began his employment with the LCPD, and well prior to the beginning of Gilmore or Johnson's tenure at the City. See VanBennekom Dep. at 5, 18-19. As such, any difference in the City's handling of his DUI arrest is attributable to the fact that it happened well prior to his employment with the City. See Silvera, 244 F.3d at 1260 (distinguishing arrest record of comparator based, in part, on timing of arrest). Notably, the Court cannot discern from the record whether Gilmore or Johnson were even aware of VanBennekom's prior DUI. Id. at 1262; see also Landry v. Lincare, Inc., 579 F. App'x 734, 737 (11th Cir. 2014) ("[T]he comparator's actions are relevant only if the plaintiff shows that the decisionmaker knew of the comparator's prior similar acts and did not discipline the comparator."). Moreover, although VanBennekom did receive a traffic citation for running a red light while employed with the LCPD, he was not arrested for this infraction. See VanBennekom Dep. at 33-34. Likewise, Stephen Shaw received a citation for failure to pay tolls, but there is no evidence that he was arrested for the toll violation either. See Response, Ex. 35: Sworn Statement of Stephen Shaw (Doc. 31-17; Shaw Stmt.) at 15. Because neither VanBennekom nor Shaw were arrested and charged with a crime while working for the LCPD, they did not

"engage in misconduct that was 'nearly identical'" to Brownfield's, and thus, are not appropriate comparators.  See Burke-Fowler, 447 F.3d at 1325; Silvera, 244 F.3d at 1259-60.

Brownfield also appears to rely on an incident involving Officer Donald Miles as evidence of a similarly situated male police officer who was arrested and not terminated. See Response at 11-12.   In May of 2013, while dropping off his children at school, Miles became angry and loud because he felt the school was unfairly singling his children out for being late.  See Response, Ex. 31: Deposition of John Andrew Miles (Doc. 31-13; Miles Dep.) at 14.   The school contacted the Hamilton County Sheriff's Office, and a sergeant came to the school, placed Miles in handcuffs and told him he was under arrest. Id. at 14-15.   However, when the sergeant began to transport Miles, he called it in under the police code for having someone with him, not as an arrest.  Id. at 15.   The Sheriff directed the sergeant to bring Miles to his office where he talked to Miles and then released him.  Id.  According to Gilmore, the Sheriff contacted her after the incident and informed her that Miles had been "arrested and then unarrested."  See Gilmore Dep. at 27-28. Miles was never actually charged with a crime and there is no record or documentation of his temporary arrest.  See Miles Dep. at 15-16; Gilmore Decl. ¶ 9.   Gilmore directed Sergeant Andy Miles, who is unrelated to Donald Miles, to conduct an IA investigation into this incident and as a result of his investigation, Miles recommended sustaining charges of Unbecoming Conduct and Contact with Other Law Enforcement Agencies against Donald Miles.  See Gilmore Decl. ¶ 9, Ex. D; Miles Dep. at 13-16.   Gilmore sustained the charges and suspended Miles for a period of time.  See Miles Dep. at 17-18; Gilmore Decl. ¶ 9.   However, Gilmore did not feel she could terminate or otherwise discipline Miles

based on this arrest "when the arrest was undone almost as quickly as it had occurred and before [Gilmore] or anyone else at LCPD knew that an arrest had even occurred," and given that "there was no written documentation of the incident leading to the arrest or the arrest itself." Id. Because Miles was "unarrested" prior to any documentation of his arrest, and never charged with a crime, this misconduct is "qualitatively different" from that of Brownfield's documented arrest and DUI charge. See McCann v. Tillman, 526 F.3d 1370, 1373-75 (11th Cir. 2008). Although a comparator's misconduct need not be "exactly identical," id. at 1374 n.4, the standard for similar conduct is nonetheless "a fairly rigorous one," Rioux, 520 F.3d at 1281. Thus, the Court finds that Miles is not a proper comparator in that comparing his arrest and prompt unarrest to Brownfield's documented DUI arrest and lingering criminal charge would be improperly confusing apples with oranges. See McCann, 526 F.3d at 1373-75; Rioux, 520 F.3d at 1280-81; Silvera, 244 F.3d at 1259-60.[12]

---

[12] Brownfield also relies on the purported DUI arrests of "[s]everal male firefighters." See Response at 12, 14-15. During her deposition, Brownfield testified that, based on her public records request, she believes "Greg Collett" and "Dwight Boozer" were arrested for DUI and nevertheless retained their positions as firemen. See Brownfield Dep. at 95-96, 185. Brownfield offers no other evidence in support of her contentions, other than her own statements, and does not indicate when these purported arrests occurred. In its Reply, the City attaches a City Memorandum indicating that Collett was arrested and charged with a DUI on October 8, 1999. See Reply, Ex. A. Based on the Memorandum, the City Manager at the time was Joseph L. Cone. Id. Significantly, Johnson maintains that there have not been any firefighters charged with a DUI since he became City manager in July 2009. See Johnson Dep. at 38. Moreover, Johnson testified that Collett was fired after he engaged in gross misconduct involving yelling at employees and falsifying timesheets. Id. at 37-38. In Johnson's recollection, Collett violated City personnel policy, but was not charged with a violation of the law. Id. In addition, according to Johnson, Boozer was fired and then reinstated after he was involved in a physical altercation with a subordinate, but no criminal charges were filed. Id. at 19-20. Johnson is not aware of any DUI charges against Boozer. Id. at 20.

Plainly, Collett and Boozer are not appropriate comparators under the circumstances of this case. To the extent that either one had a DUI charge in their past, such arrests did not occur while Johnson was the City Manager, and the disciplinary incidents that did occur during Johnson's tenure did not involve an arrest. Likewise, Brownfield presents no evidence that Gilmore, as the police chief, has any role in disciplinary decisions related to firefighters, who are part of a different department and report to a different chief. See Brownfield Dep. at 96. Thus, differences in the discipline imposed on these firefighters by different supervisors and decision-makers does not support Brownfield's claim that Johnson and Gilmore acted with discriminatory intent in deciding to terminate her employment. See Silvera, 244 F.3d at 1261.

Moreover, Brownfield's argument that the City's justification for her termination is not credible because other City employees, namely David Broom, Shea Brown, Misty Gable and Donald Wilson, were terminated after engaging in more egregious conduct than her own is unavailing. In 2011, Broom was involved in a car accident while driving his patrol car, resulting in serious injuries to himself and the other driver. See Miles Decl. ¶¶ 9-10, Ex. C. Although Broom was never arrested or charged with a crime, he was found guilty of traffic violations for failing to wear a seatbelt and unlawful speed. See id. ¶ 11. Following an IA investigation into the accident, Gilmore terminated his employment with the LCPD. See id. ¶¶ 10-12, Ex. C; Gilmore Decl. ¶ 8.[13] Prior to Gilmore's tenure as

---

Moreover, Gilmore explained that she terminated Brownfield because the DUI arrest compromised Brownfield's ability to effectively work as a police officer, and although Brownfield defeated the DUI charge, this gave the appearance that she had used her superior knowledge of DUI protocols to "[get] off on a technicality." See Gilmore Decl. at 4, ¶ 13; see also VanBennekom Dep. at 16 (explaining that he recommended termination because "if you're charged criminally, you can't be an effective law enforcement officer. You can't go to court and testify, particularly on a DUI. You're going to have a difficult time testifying on a DUI if you've been charged yourself with a DUI and prosecuted with that."). Indeed, as a police officer and in particular, a traffic homicide investigator, Brownfield's responsibilities included investigating crimes, such as driving under the influence, arresting persons for violations of the law, including driving under the influence, and testifying at trial. See Brownfield Dep. at 77. Brownfield presents no evidence that firefighters have these same relevant job responsibilities. See Brownfield Dep. at 96-97 ("I don't know what firemen are actually required to do."). As such, Brownfield fails to establish that firefighters Collett and Boozer are similarly situated to her in "all relevant respects." See Brown v. Sch Bd. of Orange Cnty., Fla., 459 F. App'x 817, 819 (11th Cir. 2012) (finding that where employee suffered adverse employment action due to an investigation into his area of responsibility, "[e]mployees with different areas of responsibility were not similarly situated to [plaintiff] in 'all relevant respects . . . .'" (quoting Holifield, 115 F.3d at 1562)); Horn, 433 F. App'x at 793-94 ("Although a comparator need not have the same job title as the plaintiff to be a sufficient comparator, material differences in 'ranks and responsibilities' may render any comparison impossible without 'confusing apples with oranges.'" (quoting Rioux, 520 F.3d at 1280-81)). As these individuals are not similarly situated to Brownfield in any way—not in position, responsibilities, alleged misconduct, or relevant supervisor—Brownfield's reliance on them as comparators is unavailing.

[13] Although Broom was terminated, Brownfield argues that he was treated more favorably than she was because he was allowed to remain on leave with pay for nine months whereas she was terminated after seven months on leave with pay. See Response at 14. The Court does not find this minor difference indicative of gender discrimination in that both Broom and Brownfield were terminated soon after the completion of the IA Investigations into their conduct. See Miles Decl. ¶ 12, Exs. B, C; Gilmore Decl. ¶¶ 8, 14. According to Miles, the investigation into Broom's accident "actually got tolled because of their injuries and because his court proceedings couldn't continue until he was physically capable of participating in the investigation. . . . And then when he was able to participate, we finished the investigation and sustained the charges." See Miles Dep. at 17.

police chief, in August of 2009, the City terminated Brown, a female police officer, after she was "arrested and prosecuted on felony charges of tampering with evidence." See Greene Decl. ¶ 15, Ex. I; Gilmore Dep. at 102. In addition, before Johnson or Gilmore began working for the City, former LCPD chief David Albritton terminated Gable, a female police officer, after she was arrested for DUI in 2003. See Greene Decl. ¶¶ 13-14, Ex. H. The City also terminated Wilson, a firefighter, in 2012, after he was arrested for lewd and lascivious conduct and while those charges were still pending. Id. ¶ 12, Ex. G. While Brownfield maintains that these individuals were terminated after engaging in conduct more egregious than her own, even if true, the Court fails to discern how that undermines the validity of the City's stated reason for Brownfield's termination. Indeed, this evidence shows that even under prior administrations, the City consistently terminates police officers if they are arrested and charged with a crime, or other serious infraction, while employed with the LCPD. As the Eleventh Circuit recently explained in Brown v. Davis, simply being arrested, "without looking into the actual merits of that arrest, [is] a plausible policy for termination of a police officer—i.e., to avoid bringing 'discredit' to the police agency (and any future actions by that officer) in the eyes of the public." See Brown, 684 F. App'x at 937.[14] Although the Brown case involved a police officer arrested for tampering with evidence, a third-degree felony, id. at 931, the reasoning is equally applicable here where Brownfield, a traffic homicide investigator, was arrested and charged with DUI.

Last, Brownfield attempts to demonstrate that the City's proffered reason for her termination was pretextual based on evidence creating an issue of fact as to whether

---

[14] The Brown case pertained to Shea Brown's termination from the LCPD, mentioned above. Id. at 929, 935. Notably, after she was terminated, the state court ultimately dismissed all charges against her. Id. at 932.

Brownfield was actually driving under the influence.  See Response at 17-18.   However, none of this evidence undermines the undisputed fact that Brownfield was arrested and charged with DUI.   It is not the role of the Court to examine the wisdom of either the FHP's decision to arrest Brownfield and charge her with a DUI, or the wisdom of LCPD's decision to terminate her because of the arrest.   See Chapman, 229 F.3d at 1030; see also Alvarez, 610 F.3d at 1256 ("[The Court does] not sit as a 'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions— indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive.").   Moreover, "an employee must meet the employer's stated reason 'head on and rebut it, and [the employee] cannot succeed by simply quarreling with the wisdom of that reason.'"   Joseph v. Columbus Bank and Trust Co., 447 F. App'x 110, 112 (11th Cir. 2011) (quoting Alvarez, 610 F.3d at 1266)).   This Brownfield has not done. It is undisputed that Brownfield was arrested, and she points to no evidence suggesting that a reasonable employer would not find the arrest of a police officer warranted termination.   See Chapman, 229 F.3d at 1030.   Indeed, "[w]hether or not [Brownfield's] arrest was legitimate, fair, or justified is not relevant insofar as she has failed to rebut the defendants' evidence that no other officers have been permitted to continue their employ after being arrested."   See Brown, 684 F. App'x at 936.   In this case, Gilmore was particularly concerned with the impact the DUI arrest would have on Brownfield's ability to testify effectively at trial.   See Gilmore ¶ 13.   With the arrest on Brownfield's record, the fact that Brownfield was not convicted of a DUI does not undermine the legitimacy of Gilmore's concern.   Indeed, rather than resolve the issue, Brownfield's exoneration created an additional problem in Gilmore's view, because it gave the appearance that an

officer with superior knowledge of DUI investigation and protocols was able to "[get] off on a technicality." See Gilmore ¶13. Brownfield offers no evidence from which a jury could conclude that this reasoning was not true, much less, evidence that the real reason was gender discrimination.[15] Because Brownfield has failed to create a genuine issue of material fact as to her termination following her arrest, the Motion is due to be granted and summary judgment entered in the City's favor.

Accordingly, it is

**ORDERED:**

1. Defendant City of Lake City's Motion for Summary Judgment (A Dispositive Motion) with Supporting Memorandum of Law (Doc. 22) is **GRANTED**.

2. The Clerk of Court is directed to enter **JUDGMENT** in favor of Defendant City of Lake City and against Plaintiff Staci L. Brownfield.

---

[15] As noted above, supra note 3, Brownfield's Response recounts several events in her statement of facts that, in her view, constituted gender discrimination. These events included negative evaluations from Gilmore, Gilmore's decision to remove her from the crime prevention unit, training request denials, Lieutenant VanBennekom's criticism of her attire, and his actions in singling her out for tardiness and telling her to write herself up. Brownfield also maintains that an additional IA Investigation was initiated against her, after she was placed on leave with pay, for "no reason," and that the City initiated an IA Investigation into Stock "solely to retaliate against him for having a relationship with" Brownfield. See Response at 11. However, Brownfield fails to present any argument explaining how these incidents constitute evidence of gender discrimination in connection with her termination. See generally Response; Sur-Reply. The Court declines to make Brownfield's arguments for her and as such, the Court did not discuss these incidents in its analysis above. Nonetheless, the Court has reviewed the evidence pertaining to the foregoing actions and it falls far short of the type of "convincing mosaic" of circumstantial evidence that could create an issue of fact as to the reason for Brownfield's discharge. Indeed, the Court is convinced that no reasonable juror could infer from this exceedingly speculative evidence that Gilmore's decision to terminate Brownfield following her DUI arrest was motivated by gender discrimination.

3.     The Clerk of Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

    **DONE AND ORDERED** in Jacksonville, Florida this 14th day of March, 2018.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record